UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cr-20431-ALTMAN

UNITED STATES,

*v.*

JAMES EDWARD DANIELS, *a/k/a* "45,"

    *Defendant.*

_____/

## ORDER DENYING MOTION FOR NEW TRIAL

After a nine-day trial, a federal jury convicted our Defendant, James Edward Daniels, of one count of conspiracy to commit kidnapping resulting in death, two counts of kidnapping resulting in death, and one count of kidnapping. *See* Jury Verdict Form [ECF No. 150] at 1; Indictment [ECF No. 1] at 1–5. Daniels now moves under Rule 33 for a new trial, advancing two arguments: *first*, that the witnesses were all liars, and that the discrepancies in their testimony totally undermine the jury's guilty verdict; *second*, that the Government misrepresented the evidence during its closing argument. *See generally* Motion for New Trial [ECF No. 165]. The Government opposes the Motion. *See* Government's Response [ECF No. 173]. And Daniels didn't file a reply. *See generally* Docket. We heard argument on the Motion on February 7, 2025. *See* Paperless Minutes [ECF No. 183]. And, for the following reasons, we now **DENY** the Motion.

### THE LAW

"Federal Rule of Criminal Procedure 33 provides that '[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. Brown*, 934 F.3d 1278, 1297 (11th Cir. 2019) (quoting FED. R. CRIM. P. 33(a) and affirming denial of motion for new trial). The defendant bears the burden of persuasion. *See United States v. Moore*, 76 F.4th 1355, 1364 (11th Cir. 2023) (affirming denial of motion for new trial because the appellant "failed to

establish that he was entitled to . . . a new trial"), *cert. denied*, 144 S. Ct. 711 (2024); *see also United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (noting, in affirming denial of motion for new trial based on newly discovered evidence, that "the defendant bears the burden of justifying a new trial").[1] In considering a motion for a new trial, we "need not view the evidence in the light most favorable to the verdict." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985) (reversing grant of motion for new trial and ordering the reinstatement of original guilty verdict). Rather, "the district court may weigh the evidence and consider the credibility of the witnesses." *Brown*, 934 F.3d at 1297 (quoting *United States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015) (Marcus, J.) (affirming denial of motion for new trial)). But a motion for a new trial based on the weight of the evidence is "not favored" and is reserved for "really exceptional cases." *Ibid.* (quoting *Martinez*, 763 F.2d at 1313).

A district court "*may* grant a new trial" in the "*rare*" case in which "evidence of guilt[,] although legally sufficient[,] is thin and marked by uncertainties and discrepancies." *Ibid.* (quoting *Butcher v. United States*, 368 F.3d 1290, 1297 n.4 (11th Cir. 2004) (emphasis added)). Even then, however, we "may not reweigh the evidence and set aside the verdict simply because [we] feel[ ] some other result would be more reasonable." *United States v. Gallardo*, 977 F.3d 1126, 1140 (11th Cir. 2020) (quoting *Butcher*, 368 F.3d at 1297)). "When a court grants a new trial in a criminal case where the jury has found the defendant guilty beyond a reasonable doubt, it is deciding 'that the jury was wrong and that the

---

[1] Because "[a] motion for a new trial is based on the presumption that the verdict against the defendant is valid[,] . . . the burden is on the defendant to demonstrate that a new trial should be granted." 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 581 (5th ed.). True, the "*extent* of the defendant's burden may vary depending on the ground on which the [new] trial is sought." *Ibid.* (emphasis added). "[M]otions for a new trial based on newly discovered evidence," for example, "are highly disfavored." *United States v. Cortes-Meza*, 685 F. App'x 731, 737 (11th Cir. 2017). But the burden is emphatically the defendant's, regardless of the basis on which he seeks the new trial. *Accord, e.g.*, *United States. v. Fritts*, 557 F. App'x 476, 479 (6th Cir. 2014) ("A defendant in a criminal case 'bears the burden of proving that a new trial should be granted.'" (quoting *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991))); *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) ("The defendant bears the burden of proving that he is entitled to a new trial under Rule 33[.]"); *cf. United States v. Aguirre*, 853 F. App'x 748, 752 (2d Cir. 2021) ("A defendant bears a heavy burden in seeking to reverse the denial of a Rule 33 motion[.]").

evidence weighed heavily against the verdict of twelve men and women honest and true.'" *Moore*, 76 F.4th at 1363 (quoting *United States v. Cox*, 995 F.2d 1041, 1044 (11th Cir. 1993)).

So, to grant a new trial, we must find that the "uncertainties and discrepancies" in the Government's case "preponderate *heavily* against the [original] verdict, such that it would be a miscarriage of justice to let the verdict stand." *Brown*, 934 F.3d at 1297 (quoting *Martinez*, 763 F.2d at 1313 (emphasis added)); *United States v. Frere*, 2008 WL 11454803, at *1 (S.D. Fla. Sept. 24, 2008) (Altonaga, J.) (same), *aff'd*, 334 F. App'x 231 (11th Cir. 2009). And, in our analysis, we must give "great weight" to the jury's "credibility determinations." *Moore*, 76 F.4th at 1364 (citing *United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020)).

## ANALYSIS

### I.   Daniels Doesn't Show that the Witness Testimony "Preponderates Heavily" Against the Verdict

Daniels's first argument—that the witnesses were all liars—is brief. In his words:

> [A] Rule 33 motion for a new trial can be granted because this is an exceptional case where there is no physical evidence tying the Defendant to the crime and the government's eye-witnesses were not credible. All witnesses either admitted to previous lying regarding the facts they were testifying about before the jury, were impeached multiple times, or both. Many of the witnesses admitted to serious usage of hard drugs during the time periods they were testifying about before the jury. The testimony of the witnesses was both internally inconsistent and inconsistent with the evidence. The witnesses all had motives to lie.

Mot. at 10–11. That paragraph is Daniels's entire argument. Daniels's Motion, in fact, consists of a Statement of Facts in which he mostly just recounts the testimony of several important witnesses, followed by the one-paragraph argument we just quoted. As the Government cogently observes, Daniels doesn't meaningfully explain *how* the witnesses' testimony was inconsistent—much less *why* those inconsistencies were material to the jury's verdict. *See* Resp. at 6. Occasionally, Daniels explains—in the Statement of Facts, not in his argument—that some piece of testimony was somehow

3

inconsistent with something else in the case. But he *never* asserts that any particular uncertainty or inconsistency was central to any witness's credibility. We think we can deny the Motion for that reason alone, but we'll nevertheless go through his Statement of Facts in detail.[2]

### a. The Standard

Fundamentally, Daniels's Motion disagrees with how the jury assessed the credibility of the witnesses. As we just noted, however, we must give "great weight" to the jury's credibility determinations. *Moore*, 76 F.4th at 1364. "[A] reasonable jury is entitled to believe Government witnesses even if they include 'an array of scoundrels, liars, and brigands.'" *United States v. Rounsville*, 2017 WL 1345978, at *3 (M.D. Fla. Apr. 12, 2017) (Howard, J.) (quoting *United States v. Hewitt*, 663 F.2d 1381, 1385 (11th Cir. 1981)). And a defendant isn't entitled to a new trial if the uncertainties and discrepancies he identifies "are[n't] critical to a determination of his guilt" or concern mere "ancillary aspects of [ ] witness[ ] testimony, and not evidence which was critical to prove a key element of the Government's case." *United States v. Estrada-Lopez*, 259 F. Supp. 3d 1358, 1373 (M.D. Fla. 2017) (Howard, J.). Moreover, where "explanations for [testimonial] discrepancies are plausible and a reasonable factfinder could credit them," that testimony doesn't "preponderate" against the verdict. *Ibid.* (citing *United States v. Stevens*, 277 F. App'x 898, 901 (11th Cir. 2008) (per curiam) (affirming denial of motion for new trial notwithstanding "inconsistencies" in the testimony of two witnesses)).

To grant a new trial based on the credibility of testimony alone, the testimony must be central to the Government's case *and* the failure of credibility must be catastrophic. In *United States v. Spellissy*, for example, the Government's "key," "primary" witness was an unindicted co-conspirator who was

---

[2] Daniels didn't request final trial transcripts. So, in disposing of the Motion, we'll largely cite to the rough transcripts, attached to this Order as Court's Exhibit A. There are two exceptions: *first*, in connection with another motion, *infra* n. 7, Herbert Barr's attorney obtained final transcripts of his client's testimony; *second*, in support of its Response, the Government obtained a final transcript of its rebuttal closing argument. We'll cite to those final transcripts as appropriate. Regardless of the transcript we cite, though, our quotations will substitute in the name of the questioner and the respondent.

supposed to testify that the defendants, his fellow co-conspirators, all worked together to commit honest-services fraud. 2006 WL 1980274, at *1–2 (M.D. Fla. July 12, 2006) (Whittemore, J.). Instead, he "testified unequivocally that he never conspired with Defendants to commit any type of fraud, never did anything illegal and was never bribed in return for preferential treatment of any of the Defendants' consulting clients." *Id.* at *2. "His credibility was shattered to the point that *the Government [itself]* argued to the jury during closing argument that it should completely disregard his testimony." *Ibid.* (emphasis added). Faced with a "discrepancy" of *that* magnitude, the trial court allowed a new trial. *Id.* at *3.

Obviously, discrepancies like that will be very rare. The garden-variety uncertainties and discrepancies that are inherent in circumstantial-evidence cases won't by themselves justify a new trial. *See, e.g., Rounsville*, 2017 WL 1345978, at *4 ("Even if the testimony at issue does not unequivocally link" the defendant to the crime, "the jury is free to 'use reasoning and common sense to make deductions' [that support the verdict]." (citation omitted)).[3]

### b. Daniels Doesn't Carry His Burden with Respect to Any of the Witnesses

Bearing in mind that we must give great weight to the jury's credibility determinations, we can dispose of the arguments (if we can call them that) Daniels has implicitly embedded in his Statement of Facts.

#### i. *Julio Verdecia Was Sufficiently Credible*

Daniels begins by attacking the testimony of the surviving victim, Julio Verdecia. Mr. Verdecia, Daniels says, testified that he and the other victims were kidnapped by "one Cuban and two black males [who] were tall and of medium build." Mot. at 2; *see also* Rough Tr. of Dec. 3, 2024, Trial

---

[3] *See also United States v. Hernandez*, 2008 WL 11340052, at *2 (S.D. Fla. June 5, 2008) (Altonaga, J.) (denying motion for new trial and holding that, even if there were any evidentiary uncertainties, "sufficient evidence uninfected by such error supports the verdicts"), *aff'd*, 427 F. App'x 784 (11th Cir. 2011); *cf. United States v. Antico*, 2018 WL 10247954, at *2 (S.D. Fla. Jan. 16, 2018) (Rosenberg, J.) (denying motion for new trial for similar reasons).

Proceedings (Part B) at 11:24–12:17. Daniels doesn't explain why this testimony isn't credible, but we assume he means to say that it's not credible because neither he nor his co-conspirator Frederick Rudolph are tall or of medium build. Mr. Verdecia also testified that the U-Haul in which he was kidnapped "only stopped once," and that no one else got into the vehicle during the stop. Mot. at 2; Rough Tr. of Dec. 3, 2024, Trial Proceedings (Part B) at 18:17–19:2. Again, Daniels doesn't say how or why this testimony shows that he's entitled to a new trial, but we assume it's because Mr. Verdecia's testimony is inconsistent with Herbert Barr's testimony that he, Daniels, and Rudolph stopped the vehicle multiple times and that someone boarded the U-Haul during one of those stops. Tr. of Dec. 9, 2024, Trial Proceedings [ECF No. 193] at 174:20–175:4, 180:22–182:8. During closing arguments, Daniels argued that, because Mr. Verdecia wasn't blindfolded, he should have been able to see whether someone else boarded the U-Haul. *See* Rough Tr. of Dec. 16, 2024, Trial Proceedings (Part A) at 88:23–89:2.

None of these so-called discrepancies are material to the verdict. Mr. Verdecia's inability to remember how many times the U-Haul stopped doesn't render his (or anyone else's) testimony unbelievable. *See United States v. Delaughter*, 2007 WL 3034645, at *2 (M.D. Fla. Oct. 16, 2007) (Whittemore, J.) (denying motion for new trial even though, on cross-examination, police-officer witness was impeached about his recollection of the number of times he'd previously arrested the defendant). Remember, Mr. Verdecia had been violently kidnapped. A jury could reasonably conclude that he had concerns more immediate than counting stops or assessing the precise heights and weights of his abductors. *Cf. United States v. O'Connor*, 650 F.3d 839, 856 (2d Cir. 2011) (rejecting attack on victim's testimony where the victim, a twelve-year-old, explained that her initial reports of sexual abuse differed from her trial testimony because she'd been frightened for herself).[4] Plus, as the Government

---

[4] Because *O'Connor* involved a sufficiency-of-evidence challenge on appeal, the Second Circuit "credit[ed] every reasonable inference that the jury could have drawn in the government's favor."

notes, Mr. Verdecia and Barr actually *corroborated* each other on other details of arguably greater significance. For example, both Barr and Mr. Verdecia testified that, at some point, the U-Haul went over train tracks. *See* Resp. at 8; *compare* Tr. of Dec. 4, 2024, Trial Proceedings [ECF No. 192] at 38:6–10 (Barr), *with* Rough Tr. of Dec. 3, 2024, Trial Proceedings (Part B) at 18:21–23 (Verdecia). And Mr. Verdecia remembered hearing one of the kidnappers speaking in English over the phone, which was consistent with Barr's testimony that, as the kidnappers were driving around town with the victims in the back of the U-Haul, unindicted co-conspirator Rodney Upshaw, also known as "Pumpkin," was directing Barr over the phone. *Compare* Rough Tr. of Dec. 3, 2024, Trial Proceedings (Part A) at 10:9–11:3 (Verdecia on direct),[5] *and* Rough Tr. of Dec. 3, 2024, Trial Proceedings (Part B) at 15:8–14 (Verdecia on cross), *with* Tr. of Dec. 4, 2024, Trial Proceedings at 35:25–36:11 (Barr on direct), *and* Tr. of Dec. 9, 2024, Trial Proceedings at 173:10–174:2 (Barr on cross). In the end, given the extreme trauma he was subjected to and the rapidly evolving circumstances he was faced with, Mr. Verdecia's testimony was, on the whole, remarkably consistent with Barr's. Finally, Mr. Verdecia's testimony that his associates were bound, tortured, and then shot in the back of the head; that he himself was bound, tortured, and then shot in the back of the head; and that he saved himself by rolling around into the street until he was discovered by a passing car was all fully corroborated by the forensics team, a 911 call, and the surveillance video from a nearby home. That the jury viewed the minor inconsistencies Daniels identified on cross-examination as relatively immaterial consequences of the passage of time—and the extreme trauma Mr. Verdecia was subjected to—doesn't come close

---

*O'Connor*, 650 F.3d at 855. That standard is more deferential to the verdict than the standard we apply on a motion for new trial. But *O'Connor* recognized, as we do here, that certain inconsistencies or omissions in a victim's testimony might be the product of distress rather than dishonesty. Even on a motion for a new trial, we give "great weight" to the jury's credibility determinations. *Moore*, 76 F.4th at 1364. Here, the jury was apparently—and reasonably, we think—unperturbed by the slight discrepancies in Mr. Verdecia's testimony.

[5] The page numbers in this rough transcript re-start partway through. The cited testimony begins on page 312 of Exhibit A.

to constituting a "miscarriage of justice." *See United States v. Stepherson*, 838 F. App'x 438, 443 (11th Cir. 2020) (affirming denial of motion for new trial where "portions of [the victim's] testimony conflicted with" prior statements and video evidence, but the testimony overall was "corroborated by other testimony and evidence").

### ii.   Herbert Barr Was Sufficiently Credible

Daniels next attacks the testimony of Herbert Barr. Daniels notes that Barr's cooperation "significantly reduced" his sentence from mandatory life to a term of years. *See* Mot. at 3. Daniels then lists several ostensible flaws in Barr's testimony. *First*, Daniels says, Barr offered inconsistent testimony about *how much* he was paid for his participation in the conspiracy. According to Daniels, Barr was squirrely about the amount—maybe it was the cancelation of a $5,000 debt, maybe it was $3,500 cash-in-hand, or maybe it was both. *Ibid. Second*, Daniels continues, when Barr took a ride-along with Miami-Dade police detectives, they showed him a photograph of Daniels and asked him whether the person in that photo had been in the U-Haul on the date of the crime. He said no. *Id.* at 4. *Third*, Daniels adds, Barr told Daniels "in the holding cell after court that he was going to do the right thing" and, we suppose, recant his testimony that Daniels was involved in the conspiracy. Apparently, Barr admitted that he'd only inculpated Daniels to protect his own girlfriend. *Id.* at 4–5.

We're not persuaded by Daniels's attacks on Barr's incentives to testify. The Government elicited testimony from Barr that, although it had waived the death penalty against him in exchange for his cooperation, it was "[n]ever a condition of [his] plea that if [he] pled guilty, death would be waived." Tr. of Dec. 9, 2024, Trial Proceedings at 253:8–17. On top of that, we instructed the jury to be wary of testimony the Government obtained through plea bargaining:

> You must consider some witnesses' testimony with more caution than others. . . . In this case, the Government has made a plea agreement with a Codefendant in exchange for his testimony. . . . But a witness who hopes to gain more favorable treatment may have a reason to make a false statement in order to strike a good bargain with the

> Government. So, while a witness of that kind may be entirely truthful
> when testifying, you should consider that testimony with more caution
> than the testimony of other witnesses.

Jury Instructions [ECF No. 147] at 6. And Daniels had ample opportunity to cross-examine Barr on his incentives to testify. Where a court properly instructs the jury and affords the defense an opportunity to conduct cross-examination, the jury's assessment of a plea-bargaining witness's credibility shouldn't be disturbed by a new trial. *See Rounseville*, 2017 WL 1345978, at *3 (denying motion for new trial where witnesses "were also accomplices in the underlying criminal enterprise," because "the Government communicated to the jury that [those witnesses] were cooperating . . . as part of their plea agreements, and defense counsel vigorously cross-examined each of them with respect to their plea agreements . . . and their ultimate motivation for testifying").

The other supposed flaws in Barr's testimony are equally unimpressive. *First*, our impression of Daniels's cross-examination is that Barr had a hard time understanding exactly what he was being asked. The thrust of his testimony, though, was that he'd accepted *some* kind of compensation for his role in a conspiracy that resulted in three kidnappings and two deaths—a fact that couldn't have endeared him to the jury. In any event, even if we accept that he was ambiguous about the amount of his compensation, we don't think that ambiguity was at all material to the rest of his testimony—nor was it inconsistent with anything any other witness said.

*Second*, at trial, Barr testified that he didn't recognize Daniels's photograph because Daniels "looked bigger in the face now than he did in th[e] picture." Tr. of Dec. 9, 2024, Trial Proceedings at 252:12–17. That a witness isn't certain about the details of a suspect's appearance doesn't warrant a new trial. *See United States v. Davis*, 2024 WL 3673717, at *6 (M.D. Fla. Aug. 6, 2024) (Honeywell, J.) (denying motion for new trial even though the Government's key witness couldn't recall important details about the defendant's appearance and gave inconsistent statements about the defendant's attire). In any case, on redirect, Barr also testified that he *never* told the police (or otherwise later

asserted to anyone) that Daniels *didn't* participate in the conspiracy or that he *wasn't* in the U-Haul. *See* Tr. of Dec. 9, 2024, Trial Proceedings at 252:9–22 ("Government's Counsel: Did you ever tell the agents that 45 [Daniels] was not in the car that day? Barr: No. . . . Government's Counsel: At any point did you tell them, actually, like, "It's not 45, it was never 45, I lied to you when I first met you, I lied to you on the second day, lied two years later"? Did you ever say that? Barr: No.").

*Third*, when Daniels cross-examined Barr, he asked Barr directly why Barr had told Daniels and Rudolph that he was going to do "the right thing." Barr explained that he'd lied to Daniels and Rudolph because he'd been placed "right back in [a] cell" with them, even though they knew that he'd cooperated against them.[6] In other words, Barr testified that, trapped in a prison cell face-to-face with two men he'd just implicated in a kidnapping-and-double-murder plot, he lied to save his own skin. That explanation seems rather *plausible* to us—and the jury seems to have found it plausible, too. We can't blame them.

---

[6] Here's the full context for that statement:

> Daniels's Counsel: When you were in the holding cell, there were other inmates present, right?
>
> Barr: Yes.
>
> Daniels's Counsel: And did you tell Mr. Daniels that the FBI asked about him, so you gave information about him because you couldn't let your girlfriend Roxanna get in trouble?
>
> Barr: I said that to him, because they had done made the statement about I was cooperating and then they put me right back in the cell with them. So, I said to him, like, you know, this is what happened.
>
> [ . . . ]
>
> Daniels's Counsel: Okay. And did you tell him that he didn't need to worry about anything, because you were going to do the right thing?
>
> Barr: Yep, because I was right there in front of him.

Tr. of Dec. 9, 2024, Trial Proceedings at 212:21–213:16.

Finally, Daniels complains that the detectives "provided [Barr] information about what they believed happened, corrected his version of events, and stopped their [recorded conversations] with him several times to have discussions with [him]." Mot. at 4. We assume Daniels is *trying* to argue that the police coached Barr—though (again) he doesn't actually advance this argument. In either event, Barr never said that the police coached him—and no officer or report suggested that any such coaching ever occurred. Daniels's cross on this point thus (unsurprisingly) convinced no one—and we can't say we were all that impressed with the argument either.

Here's the point: Barr is unquestionably a criminal who didn't strike *us* as a paragon of honesty and integrity—probably because he's the kind of guy who, like Daniels, sells drugs and kidnaps people for the purpose of killing them. But that doesn't mean we think he was lying when he said that Daniels was one of the people involved in the kidnapping—and it doesn't mean the jury should have disbelieved him either. As the Government correctly notes, we instructed the jury to evaluate every witness's testimony against *both* the witness's own inherent credibility *and* the other evidence in the case:

> When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. . . . To decide whether you believe any witness I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? . . . Did the witness's testimony differ from other testimony or other evidence?

Jury Instructions at 5; *see also* Resp. at 8 ("The jury assessed the testimony of every witness and assessed their own credibility as well as assessed the testimony of the witnesses with the other evidence in the

case in reaching their verdict."). The witnesses weren't required to come to court with "one, recited, identical statement," Resp. at 8—which a jury might have found *less* credible than what it heard.[7]

### iii.   *Javis Wheeler and Janice Turner Were Sufficiently Credible*

When it comes to Javis Wheeler and Janice Turner, Daniels doesn't really identify *any* inconsistencies in their testimony. His briefing about them is just a summary of their testimony, coupled with a generalized complaint that they were "using cocaine at all times relevant" to their testimony. Mot. at 5–6. Remember, to deserve a new trial, Daniels must show that this is a "really exceptional case" where the "uncertainties and discrepancies" so preponderate against the verdict that we simply can't let it stand. *Brown*, 934 F.3d at 1297–98. He can't carry that burden by simply regurgitating the witnesses' testimonies without making arguments about them. *Id.* at 1298 (affirming denial of motion for new trial partly because the appellant "[did] not argue that the government's case against him was 'marked by uncertainties and discrepancies' or that the credibility of the government's witnesses was impeached at trial"). In any event, on our careful review of the transcript, we didn't find very much to criticize about these witnesses' testimony—which is probably why Daniels hasn't identified much.

Let's be blunt: Mr. Wheeler and Ms. Turner, though memorable and sometimes funny, indeed regularly and heavily used cocaine. But, as the Government correctly observes, the fact that these two witnesses used cocaine, and whether and how it impacted their memories, "was discussed *ad nauseam*

---

[7] After Daniels filed his Motion, Barr's attorney submitted a motion in which he represented that "detailing [Barr's] conduct based on discovery and attorney-client communications risk[ed] advancing a narrative that differ[ed] from his trial testimony." Motion to Continue Sentencing Hearing [ECF No. 179] ¶ 4. At the hearing on February 7, 2025, Daniels requested permission to incorporate that representation into the Motion. We orally permitted Daniels to do so, though it doesn't help him at all. At trial, Daniels had the opportunity to cross-examine Barr about any testimony that (he believed) was inconsistent with the discovery in this case. He did that—painstakingly going over Barr's current testimony in light of *different* statements Barr had made in the past. None of this moved the jury to find him not guilty—principally because, as we've said, no one was surprised that the criminals Daniels hung out with weren't exactly angels and because the evidence of Daniels's guilt was, when considered as a whole, overwhelming.

during their direct and cross examination testimony." Resp. at 7. Despite this heavy emphasis on their cocaine use, Mr. Wheeler and Ms. Turner came off quite credibly—and they corroborated the other witnesses' testimony that Daniels (among others) participated in this kidnapping conspiracy—which is probably why the jury believed them. None of that strikes us as a "miscarriage of justice." *Rounsville*, 2017 WL 1345978, at *3 (noting that a jury may believe the Government's witnesses even if they're "an array of scoundrels, liars, and brigands").

Aside from the cocaine, Daniels comes closest to a colorable argument with respect to Mr. Wheeler when he notes that "Mr. Wheeler admitted concern that he could get in trouble for washing out the van," Mot. at 5—by which he meant the U-Haul in which the victims were transported. In his closing argument, Daniels raised the point that we assume he's trying to make in his Motion: "Why wasn't Javis Wheeler charged?" Rough Tr. of Dec. 16, 2024, Trial Proceedings (Part A) at 94:19. Presumably, Daniels thinks that Mr. Wheeler wasn't charged because he falsely implicated Daniels in exchange for his freedom. But, again, Daniels doesn't actually advance this argument. In fact, he didn't even lay the *groundwork* for that argument during his cross-examination; he never tried to interrogate Mr. Wheeler's motives for testifying. On top of that, the Government addressed Daniels's inchoate argument about Mr. Wheeler's motivations during its rebuttal closing:

> And you should credit Javis Wheeler's testimony, because Mr. Wheeler, as we saw, had many health problems—hit by a car, and he was in the hospital, he's going blind, he's on dialysis. He's not concerned about being charged with a crime. All right? He's barely making it. He's concerned to see another day. He's not concerned about whether or not we are going to now go and indict him for this crime. So that's not the reason why he told you what he told you.

Tr. of Prosecution Rebuttal Argument [ECF No. 176] at 17:1–8. The jury evidently concluded that Mr. Wheeler was credible, and we give "great weight" to that determination. *Moore*, 76 F.4th at 1364.

As for Ms. Turner, Daniels says that she "admitted to anonymously calling in multiple fake Crimestoppers' [sic] tips to collect reward money and implicate Mr. Upshaw's girlfriend because she

had been disrespectful to Ms. Turner." Mot. at 6. She did admit that much, but we don't see how that helps Daniels. She, after all, conceded that she had done wrong, explained why she had done it, and was cross-examined extensively on the matter. The jurors got to evaluate her credibility in real time and, after considering all the evidence, still believed her. We can't say that they were wrong to do so. In the end, Ms. Turner's falsely inculpatory call was an "ancillary aspect" of her testimony, "not evidence which was critical to prove a key element of the Government's case." *Estrada-Lopez*, 259 F. Supp. 3d at 1373.

### *iv.  Edwin Rojas Was Sufficiently Credible*

Daniels spends the least amount of time on Mr. Rojas. He observes—again, without any argument—that Mr. Rojas offered shifting testimony about whether Barr was present at a December 5, 2020, planning meeting that included Upshaw, Daniels, and Rudolph. During cross-examination, Mr. Rojas said that Barr *was* present. But, during the Government's redirect, Mr. Rojas seemed to say that Barr *wasn't* present—or, at least, that he didn't *remember* whether Barr was present. *See* Mot. at 6–7. It was clear from Mr. Rojas's testimony, though, that he was having some trouble remembering whether Barr was present at the meeting because it took place over four years ago. *See* Rough Tr. of Dec. 9, 2024, Trial Proceedings (Part B) at 120:10–19 ("Government's Counsel: And the conversation you overheard at Pumpkin's house was like four years ago, is that right? Mr. Rojas: Yes."). Plus, he testified, he couldn't quite focus during trial because he was preoccupied by his wife's cancer diagnosis.[8] Of course, all this is beside the point because there was one thing

---

[8] Rojas brought up his wife's cancer diagnosis after Daniels confronted him on cross with inconsistencies between his trial testimony and his grand jury testimony (from May 9, 2023):

> Daniels's Counsel: Well, you came here to the Court [o]n May 9th of 2023, do you remember that?
>
> Mr. Rojas: Yes.

Mr. Rojas has *never* wavered from, which is that Daniels and Rudolph (and Pumpkin) were *definitely* at that meeting[9]—and, at a trial of Daniels and Rudolph, that's all that *really* matters.

––––––––––––––––––––

[ . . . ]

> Daniels's Counsel: And on that day [you testified that you saw Rudolph, Barr, and Daniels arrive together?]
>
> Mr. Rojas: Yes. That is right.
>
> Daniels's Counsel: Okay. So, that answer that you gave was correct.
>
> Mr. Rojas: Yes, that is right.
>
> Daniels's Counsel: So, the answer you gave today is incorrect.
>
> Mr. Rojas: Yes. . . . But today I'm a little bit . . . [t]oday I'm forgetting things a little bit here and there.
>
> Daniels's Counsel: Okay. Do you have any memory issues?
>
> Mr. Rojas: No. Well, what I will say is that my wife is at home[,] she has cancer [and] I'm here, I mean, that's something I can't deny.
>
> Daniels's Counsel: So, you feel like you're a little bit distracted today.
>
> Mr. Rojas: Yes.

Rough Tr. of Dec. 9, 2024, Trial Proceedings (Part B) at 109:2–110:17.

[9] Even as Mr. Rojas vacillated during redirect about *Barr's* attendance at this planning meeting, he remained certain that Daniels and Rudolph were there:

> Government's Counsel: So, tell us about Herbert Barr, because we're probably all confused about that point, right? So, was, as you recall today, as you're sitting here today, do you remember Herbert Barr being at Pumpkin's house two weeks before December 5th?
>
> Mr. Rojas: That I don't remember.
>
> Government's Counsel: You don't remember if he was there that day?
>
> Mr. Rojas: No.
>
> Government's Counsel: Okay. Do you remember if Frederick Rudolph was there?
>
> Mr. Rojas: Yes, it was Fred, 45 and Pumpkin.

Finally, Daniels claims that, "during prior testimony, every action and statement that [Mr. Rojas] had attributed to Mr. Daniels had previously been attributed to Mr. Barr." Mot. at 7. We think Daniels is referring to this exchange from Mr. Rojas's cross-examination, in which Daniels pressed Mr. Rojas on what he'd been able to overhear of the planning meeting:

> Daniels's Counsel: [We]re you able to make out exactly what they [were talking about?]
>
> Mr. Rojas: Well, you could hear a bit of it.
>
> Daniels's Counsel: Okay. Was 45 talking about how to do the job?
>
> Mr. Rojas: No.
>
> Daniels's Counsel: Okay. Did you ever tell the police that that's what he was talking about?
>
> Mr. Rojas: I never once said that he was the one who was talking, it was Pumpkin.
>
> Daniels's Counsel: Okay. So, you never heard 45 say anything about whatever Pumpkin was planning.
>
> Mr. Rojas: He had said that they shouldn't talk too much, because I was there working.
>
> Daniels's Counsel: He said—what? I'm sorry—that they shouldn't talk too much, because you were there working?
>
> Mr. Rojas: Yes, he said that they shouldn't talk too much because I was there working. . . . [A]nd the door wasn't closed, the door was kind of a little bit ajar.
>
> Daniels's Counsel: Okay. Isn't that actually something that you said that Herbert Barr was saying back when he was at that meeting?
>
> Mr. Rojas: No.

---

Government's Counsel: So, you remember the three of them were there but you don't remember if Herb was there?

Mr. Rojas: No, he was not there.

Rough Tr. of Dec. 9, 2024, Trial Proceedings (Part B) at 120:20–121:7.

> Daniels's Counsel: Okay. Did you ever say that Herbert Barr closed the door and asked Pumpkin if he trusted you and felt comfortable to do this in your presence?
>
> Mr. Rojas: Uh-huh.
>
> Daniels's Counsel: Is that a yes?
>
> Mr. Rojas: Yes.
>
> Daniels's Counsel: Okay. Th[en] on the day of this meeting now, Herbert Barr's back in the mix, and he came, closed the door and asked Pumpkin if he was comfortable with talking about it in front of you.
>
> Mr. Rojas: Yes.
>
> Daniels's Counsel: Okay. So, it was Herbert Barr, not 45 that said that.
>
> Mr. Rojas: Yes, that's right.

Rough Tr. of Dec. 9, 2024, Trial Proceedings (Part B) at 112:5–113:12. It's not obvious to us from this testimony that Daniels caught Mr. Rojas in a lie. Mr. Rojas seems to have been testifying that *both* Daniels and Barr (rather reasonably) expressed reservations about discussing their murder plot in front of Mr. Rojas. But even assuming that Mr. Rojas in fact changed his mind midstream about who'd said what, his testimony still put Daniels in the planning meeting with Barr, Rudolph, and Upshaw. The jury found Mr. Rojas credible enough, and Daniels gives us no reason to conclude that it's a miscarriage of justice that they did so.

### v. Malek Brouri Was Sufficiently Credible

Finally, there's Malek Brouri—who, like Barr, accepted a plea deal. Again, though, we instructed the jury to be wary of testimony from plea-bargained witnesses. *See* Jury Instructions at 6. That's sufficient to deny Daniels's request for a new trial on that issue. After all, "it simply can't be that any time the government uses a cooperating witness, that witness's testimony itself constitutes a ground for a new trial." *United States v. Witt*, 43 F.4th 1188, 1195 (11th Cir. 2022) (affirming denial of motion for new trial). Plus, on direct, Mr. Brouri testified that the Government never promised him

anything to obtain his cooperation. *See* Rough Tr. of Dec. 11, 2024, Trial Proceedings (Part B) at 34:16–35:6.

Daniels next complains that some of Mr. Brouri's testimony was inconsistent with his prior statements. He, for instance, initially lied to police about his role in (and knowledge of) the drug-dealing conspiracy, and he supposedly misstated the timing of "multiple phone calls [he'd made] to Upshaw on December 5, 2020[,] allegedly to coordinate a food order for Upshaw's mom." Mot. at 7. But Mr. Brouri was quick to admit that he'd initially lied to police to minimize his involvement and to avoid jail time.[10] That's what criminals (including cooperating criminals) do—they lie and cheat and commit crimes. If that were a reason to vitiate a jury's verdict and order a new trial, we'd never have final convictions in cases where (as here) criminals cooperate against other criminals. *Cf. Witt*, 43 F.4th at 1195. And, to the extent Mr. Brouri ever lied about the timing of calls he'd made to Upshaw, Daniels

---

[10] Mr. Brouri's insistence that he'd lied was practically the theme of his testimony. On cross-examination, he even declined to refresh his recollection by reviewing his previous statements because, in his telling, those statements were utterly false:

> Daniels's Counsel: Would it refresh your memory to review your statement that you gave to police on July 28, 2022, where you specifically say exactly that that nobody gave you—nobody said anything to you directly?
>
> Mr. Brouri: You talking about July 28th?
>
> Daniels's Counsel: Yes.
>
> Mr. Brouri: I told you I lied about almost everything on July 28th. When you get to—you're handcuffed, you're about to go to jail, whatever, you are going to minimize everything, you're not going to talk[.] [S]o I did [lie].

Rough Tr. of Dec. 11, 2024, Trial Proceedings (Part B) at 98:16–25; *see also id.* at 72:22–23 ("Mr. Brouri: I'm just telling you, when I was arrested I lied to the FBI."); *id.* at 108:15–16 ("Mr. Brouri: I've told you several times. A myriad of times on July 28th, I lied to the law enforcement.").

never cross-examined him on this point—and he never mentioned it in closing argument.[11] Setting aside that Daniels is trying to leverage his own failings in *this* trial to get himself *another* trial, we can't grant a new trial unless "the credibility of the Government's witnesses was impeached." *Rounsville*, 2017 WL 1345978, at *2 (citing *Martinez*, 763 F.2d at 1313 (cleaned up)). Since Daniels never cross-examined Mr. Brouri on this point, Mr. Brouri necessarily wasn't impeached on the issue.

Daniels also notes that, although Mr. Brouri testified that Daniels had *admitted* he'd hidden a watch and jewelry in his own yard, an FBI search of Daniels's yard failed to locate any jewelry. *See* Mot. at 8. Here, again, Daniels falls well short. The Government's case didn't turn on whether jewelry was retrieved from Daniels's yard. In fact, as Daniels himself concedes, "the Government did not produce any witness who testified that any of the victims had any jewelry which was taken from him." *Ibid.* That no jewelry was uncovered in Daniels's yard thus didn't undermine any part of the Government's case (except Mr. Brouri's credibility). And, as to Mr. Brouri's credibility, the jury repeatedly heard that Mr. Brouri is a criminal who lies to protect himself and his family—so his decision to lie about something *else* (something relatively collateral to the case) was as unsurprising as it was inconsequential. What mattered to the jury was that Mr. Brouri corroborated the central aspects of so many of the other witnesses' testimony on big-ticket items—for instance, that Daniels, Rudolph, Barr, and Pumpkin were part of a drug-trafficking organization; that all these Defendants participated in the kidnapping-and-murder plot; and that, after the murder left Pumpkin flush with cash, he

---

[11] On cross-examination, Daniels asked Mr. Brouri whether he'd called Upshaw "frequently" on December 5, 2020. Rough Tr. of Dec. 11, 2024, Trial Proceedings (Part B) at 86:6–87:7. Daniels expressed skepticism that Mr. Brouri and Upshaw had in fact been discussing food orders for Upshaw's mother and not a drug resupply, but he didn't attempt to impeach Mr. Brouri on this issue with any evidence at all. *Id.* at 87:8–20. As a matter of fact, Daniels had a cellphone report for Mr. Brouri's number; he asked Mr. Brouri if looking at it would refresh his recollection, but Mr. Brouri declined, and Daniels didn't insist. *Id.* at 86:6–13. Mr. Brouri was therefore never presented with, let alone cross-examined on, the records about which Daniels now claims he was lying. Similarly, during closing argument, Daniels obliquely mentioned the food orders again, but said nothing about the timing of the calls. *See* Rough Tr. of Dec. 16, 2024, Trial Proceedings (Part A) at 117:11–13.

compensated the other participants in various ways. The jury was thus entitled to put aside the problems with Mr. Brouri's credibility and find, consistent with all the other evidence in the case, that he was telling the truth about Daniels's role in the kidnappings. *See Estrada-Lopez*, 259 F. Supp. 3d at 1373 (denying motion for new trial where the defendant "focuse[d] on inconsistent testimony regarding two specific facts, neither of which [we]re critical to a determination of his guilt" rather than "evidence which was critical to prove a key element of the Government's case").

Lastly, Mr. Brouri testified that Daniels told him in 2020 that he, Daniels, had paid off his rent for the entire year. On this issue, Daniels presented a witness, Edna Cook, who (he hoped) would undermine this aspect of Mr. Brouri's story. But, though Daniels's lawyer continues to believe that something important happened while Ms. Cook was on the stand, the fact is that Ms. Cook ended up adding nothing at all. Ms. Cook was the owner of the property Daniels allegedly lived in at the time of the murders.[12] On direct, Ms. Cook testified that, in 2019—a year *before* Daniels supposedly told Mr. Brouri that he'd prepaid his rent—she'd filed for chapter 13 bankruptcy and had stopped collecting rent from that property. *See* Rough Tr. of Dec. 12, 2024, Trial Proceedings (Part B) at 48:15–49:17 ("Ms. Cook: [In 2019], I notified all of the tenants that I had surrendered the property to the banks, and that—that I [would] no longer be collecting rent, as well as doing any maintenance, and they would have to vacate the property immediately."). With this testimony in hand, Daniels's lawyer sat down—seemingly content that she'd thus undercut Mr. Brouri's claim that Daniels had paid the whole year's rent in advance. How (Daniels's lawyer seemed to be saying) could Daniels have paid

---

[12] The Government's cell-site expert testified that "Daniels's residence [was] at . . . 2744 Northwest 49th Street, Miami, Florida[.]" Rough Tr. of Dec. 10, 2024, Trial Proceedings (Part B) at 98:8–10. Ms. Cook testified that, prior to 2019, she owned the property at "2742-2744-2746 and 2748," "a four-plex on 49th Street and 27th Avenue." Rough Tr. of Dec. 12, 2024, Trial Proceedings (Part B) at 48:7–14.

the rent in full when the owner herself was testifying that she'd stopped collecting rent on that apartment over a year before the murders?[13]

Unfortunately, on both direct- and cross-examination, Ms. Cook admitted that she couldn't recognize Daniels. *Id.* at 48:2–6 ("Daniels's Counsel: Okay. And now let me ask you, do you know any of the people sitting at the table over here? Ms. Cook: No, I do not. Daniels's Counsel: Okay. So, you don't know James Daniels, correct? Ms. Cook: No, I do not."); *id.* at 53:22–24 ("Government's Counsel: [S]o we have established you don't know James Daniels, right? Ms. Cook: No, I do not."). *Then*, she admitted that Daniels wasn't even the person she had listed as the resident of the apartment in question.[14] That would have been bad enough. But things devolved further during the Government's cross-examination. Ms. Cook admitted that she didn't know who'd taken over the property after the bank foreclosed on it, and she conceded that she had no idea whether Daniels was living there in 2020, the only year relevant to Daniels's attack on Mr. Brouri's testimony:

> Government's Counsel: So, you told us that in 2019, your propert[y] went into foreclosure, is that right?
>
> Ms. Cook: Yes.
>
> Government's Counsel: Do you know who bought it after you?
>
> Ms. Cook: No, I don't.

---

[13] Daniels complains in a footnote that, "[t]hroughout the entire trial, the Government made references to an address"—the 2744 Northwest 49th Street address—"they claimed was Daniels's residence; yet, there was never any evidence offered that corroborates this." Mot. at 4 n.1. Setting aside that Daniels never made this point during trial or in closing, if it were truly his position that he didn't reside at 2744 Northwest 49th Street, it'd have made no sense for him to call Ms. Cook to try to show that he hadn't prepaid his rent.

[14] Ms. Cook testified that, when she surrendered her 49th Street property to the bank in 2019, the 2744 unit "was rented to [a] Ms. Rogers." Rough Tr. of Dec. 12, 2024, Trial Proceedings (Part B) at 49:18–21. At Ms. Cook's request, Ms. Rogers vacated her unit and handed her keys to her neighbor in the 2742 unit, a Mr. Whitley. *Id.* at 50:2–9. Ms. Cook later discovered in 2023 that Mr. Whitley—who, again, had the keys to Daniels's unit—had remained on the property even after she'd told him to vacate. *Id.* at 50:17–21.

> Government's Counsel: Did you ever speak to the person who bought it after you?
>
> Ms. Cook: (No response.)
>
> Government's Counsel: You don't know who that is, do you?
>
> Ms. Cook: No, I don't.
>
> Government's Counsel: So, if James Daniels was on the property you'd have no idea, is that right?
>
> Ms. Cook: That's correct.
>
> Government's Counsel: And if James Daniels was on the property, in December of 2020, paying someone else, you'd have no idea, would you?
>
> Ms. Cook: No.

*Id.* at 54:13–55:2. Since Ms. Cook couldn't say whether Daniels had *ever* been on her property or whether he'd *ever* paid rent to the new landlord (whoever that was), she necessarily couldn't say whether (or not) Daniels had paid a full year's rent upfront after the murders in 2020. Ms. Cook, in short, gave Daniels nothing at all.

*      *      *

Even with our exceedingly charitable reading of Daniels's Motion—in which (again) we've filled in many of the arguments Daniels himself failed to advance—we find no merit in his demand for a new trial. He hasn't pointed to anything that would call the jury's verdict into question. Nor did we, in reviewing the hundreds of pages of trial transcripts, find anything that would come close to justifying a new trial in this case.

## II.    Daniels Hasn't Shown Prosecutorial Misconduct

Daniels's second argument is that the Government engaged in prosecutorial misconduct by improperly mispresenting evidence during its rebuttal closing argument. Here, again, he falls far short of the mark. As we've said, Daniels filed his Motion without obtaining the transcript of the relevant

portion of the argument, so his "paraphrasing" of the Government's remarks is somewhat confusing.

*See* Mot. at 12–13. Here's what the Government actually said:

> [J]ust because your cell sites don't put you somewhere [doesn't mean] that you're not there. You heard the testimony, right? The CAST expert explained to you that it's a number of things. You could have left your phone somewhere, and it's in use because someone's making phone calls or someone's using your phone, or your phone's turned off, or nobody's contacting you. There's multiple reasons why your cell sites aren't pinging at certain locations, which is why, for example, Daniels' phone is pinging at his house around 5:11, 5:15 [p.m.].
>
> Now, counsel told you he was pinging all day at the house. That's not true. You can go through it yourself. He's pinging at the house around 5:11 [p.m.], which means his phone is there. But you also know that he had multiple phones, as drug dealers do. So just because one of his phones is at his house doesn't mean anything at all. It means that one of his phones is at his house.

Tr. of Prosecution Rebuttal Argument at 10:16–11:6.

Daniels's objection is to the last three sentences—and, in particular, to the implication that, because he had multiple phones, the fact that *one* of those phones was at his house on the day of the murders doesn't mean that *he* was at his house. This implication is unfair, he argues, because the Government had "the cell phone records of at least one other phone belonging to Mr. Daniels," and those records "also did not place [Daniels] at the scene of the crime." Mot. at 11–12. "By misrepresenting the evidence," Daniels claims, the Government created "the impression that Mr. Daniels had another phone that the Government did not know about that would implicate him in the crime." *Id.* at 12.

"When a defendant fails to object to the prosecutor's closing argument, relief is available to rectify only plain error." *United States v. Maradiaga*, 987 F.3d 1315, 1324 (11th Cir. 2021) (quoting *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)). Plain error is error that seriously "affect[s] the defendant's substantial rights," *United States v. Hall*, 314 F.3d 565, 566 (11th Cir. 2002), such that "a

reasonable probability arises that, but for the [error], the outcome of [a] trial would have been different," *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). We consider the following factors in assessing the extent to which prosecutorial misconduct during closing argument affected a defendant's substantial rights: "(1) whether the statements were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the district court's jury instructions; (4) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; and (5) the strength of the competent proof to establish the guilt of the accused." *Maradiaga*, 987 F.3d at 1325 (first citing *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1182 (11th Cir. 2010); and then citing *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994)). Additionally, "[t]he government's comments in closing argument must [ ] be 'viewed in the context of the record as a whole.'" *Ibid.* (quoting *United States v. Harmas*, 974 F.2d 1262, 1269 (11th Cir. 1992)).[15]

*Maradiaga* is a good example of how courts conduct this analysis. The defendant there was found guilty of using a fraudulent immigration document to obtain a Florida driver's license. *Id.* at 1320–21. His defense was that he didn't know the document was fraudulent because he'd received it from an attorney named "Val." *Id.* at 1321. The Government knew that someone named Valois Nunez-Artiles existed, and that this Valois "had sold false orders of supervision and, at least once, had claimed to be a lawyer." *Id.* at 1325. But, during the defendant's cross-examination, the defendant

---

[15] *Maradiaga*'s five-factor analysis synthesizes two different four-factor tests that have been historically by the Eleventh Circuit. *Compare Reeves*, 742 F.3d at 505 ("We generally consider four factors: (1) whether the challenged comments had a tendency to mislead the jury or prejudice the defendant; (2) whether the comments were isolated or extensive; (3) whether the comments were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof establishing the guilt of the defendant." (citing *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009))), *with Spencer*, 609 F.3d at 1182 ("'In determining whether arguments are sufficiently egregious to result in the denial of due process,' facts such as the following may be considered: '(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors.'" (quoting *Land v. Allen*, 573 F.3d 1211, 1219–20 (11th Cir. 2009))). We don't think there's any meaningful difference between these tests.

couldn't remember any information about "Val"—not his last name, or his phone number, or the name of his law firm. *Id.* at 1324. In closing, the Government used that cross-examination testimony to undermine the defendant's knowledge defense: If he didn't know anything about this supposed attorney, the Government said, he couldn't credibly have believed that he'd received a genuine legal document. *Ibid.* The Government then took it a step further and argued that Val *didn't exist at all.* *Id.* at 1325. After the jury returned a guilty verdict, the defendant moved for a new trial, which the district court denied. *Id.* at 1321; *see also* Order Denying Motion for a New Trial at 1, *United States v. Maradiaga,* No. 18-cr-20885 (S.D. Fla. May 1, 2019) (Scola, J.), ECF No. 79. The Eleventh Circuit affirmed. *See Maradiaga,* 987 F.3d at 1328. In the Circuit's view, although the Government's suggestion that Val didn't exist was "inartful" and "misleading," the error appeared to be unintentional. *Id.* at 1326 (quoting *Maradiaga,* Order Denying Motion for a New Trial at 1). Plus, as the Circuit noted, the defendant never objected, the court instructed the jury that the lawyers' closing arguments weren't evidence, and the "misleading" statement didn't outweigh the other evidence of the defendant's guilt. *Ibid.* ("[W]e agree with the district court that the government's statements, while some may be characterized as misleading, as a whole did not rise to the level of prosecutorial misconduct. First, the government's suggestion that 'Val' did not exist . . . appears to have been [ ] unintentional[.] Second, defense counsel never objected[.] Third, the district court instructed the jury that '[a]nything the lawyers say is not evidence and is not binding on you.' . . . Finally—and most importantly—[the defendant] cannot show prejudice. . . . [T]here was overwhelming, competent evidence [of his guilt].").

Our case is similar. Even accepting Daniels's claim that the Government's statements were "misleading," "as a whole [they] did not rise to the level of prosecutorial conduct." *Ibid.* As a preliminary matter, we note that Daniels doesn't even engage with the five-factor test the Eleventh Circuit outlined in *Maradiaga* (or any other test). He simply concludes that "there [is] a reasonabl[e] probability that, but for the prosecution's statement, the outcome [of the trial] would

have been different." Mot. at 13. He offers us no justification for this contention—and cites no relevant legal authorities—which is reason enough to reject his claim out of hand. *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."). In any event, the five-factor test weighs heavily against Daniels here.

*First*, the statements were isolated. The Government's closing arguments spanned more than ninety minutes—during which the prosecutors painstakingly analyzed the many ways in which the mostly unaffiliated witnesses corroborated one another's accounts of Daniels's participation in the kidnappings. Daniels's notion that the jury convicted him, *not* because of the mountains of corroborated and overwhelming evidence the Government presented over two weeks of trial—which it effectively summarized over ninety minutes of closing arguments—but rather because of three throwaway lines a prosecutor tucked into a few-second bit in her rebuttal closing about a cellphone that *didn't* ping off the relevant towers is, in a word, absurd.

*Second*, Daniels didn't object to the statement at all. Indeed, not only did Daniels not object during closing arguments, but he never introduced his own cell-site expert or the supposedly exculpatory phone records for his second phone. Daniels informed us several times during the trial that he might call his own CAST expert, and we even allowed that expert to listen in over Zoom to the trial testimony of the Government's CAST expert. Presumably, if the records of the second phone had mattered at all—if they had shown *anything* of import—Daniels would have presented them. He didn't—and he can't now sandbag the Government by harping on the records' overarching significance now that his trial strategy has failed. *Accord Maradiaga*, 987 F.3d at 1326 (affirming denial of motion for new trial partly because the defendant "never objected to the government's statements during closing argument").

*Third*, we instructed the jurors that "anything the lawyers say is not evidence and isn't binding on you," and that "[their] own recollection and interpretation of the evidence is what matters." Jury

Instructions at 4.[16] "We presume that jurors follow the instructions given by the district court." *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011) (citing *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005)).

*Finally*, as to the balance between the fourth and fifth factors, we weigh the vanishing unlikelihood of prejudice against the strength of the rest of the Government's case and conclude that the evidence more than supported the jury's verdict. The Government didn't say that there *was* a second phone that would implicate Daniels. It merely said that Daniels had *multiple* phones, so the fact that one of them was pinging at his home didn't mean that *he* was at home. That's an obviously true statement. And, to the extent there was anything improper about that comment, the Government (as we've highlighted) introduced overwhelming evidence of Daniels's guilt—much of it from the people who participated in the crime, who witnessed part of the planning of the crime, or who were present in its aftermath. No new trial is justified here.

We reject Daniels's comparison to the facts of *Davis v. Zant*. As the Government correctly notes, *see* Resp. at 12, *Davis* was an extraordinary case. The two defendants there—a boyfriend and girlfriend—each confessed to murdering the victim. *See Davis*, 36 F.3d at 1540. But the boyfriend recanted his confession after the girlfriend pled guilty to the murder. *Id.* at 1540–41. At the boyfriend's trial, the district court excluded the girlfriend's confession. *Id.* at 1544. But, when the prosecution

---

[16] We told the jury the same thing when we gave them their preliminary instructions:

> You must decide the case solely on the evidence presented here in the courtroom. Evidence can come in many forms. . . . [B]ut certain things are not evidence and must not be considered by you in any way. For example, statements and arguments of the lawyers. In their opening statements and closing arguments, the lawyers will discuss the case with you, but their remarks are not evidence. Got that?

Rough Tr. of Dec. 2, 2024, Trial Proceedings (Part A) at 249:19–250:23.

cross-examined the boyfriend, he said that he recanted because his girlfriend had confessed, and he complained that "they"—the judge and the prosecutors—hadn't allowed the jury to hear her confession. *Id.* at 1546. The prosecutor correctly objected that the girlfriend's confession had been excluded. *Ibid.* But he *incorrectly* said, in the jury's presence, that the girlfriend *hadn't* confessed. *Ibid.* He doubled down on this error during closing arguments, *repeatedly* telling the jury that the girlfriend hadn't confessed and that the boyfriend had made it all up. *Id.* at 1547–48. Of course, as the prosecutor knew perfectly well, the girlfriend *had* in fact confessed. So, the case was rather clear-cut: "Little time and no discussion is necessary," the Eleventh Circuit explained, "to conclude that it is improper for a prosecutor to use misstatements and falsehoods." *Id.* at 1548.

Our case is nothing like *Davis*. The Government's entire case there depended on whether the jury believed the boyfriend's initial confession, on the one hand, or his later explanation, on the other. The prosecutor's blatant and repeated lies on this focal point of the whole case—lies that allowed the prosecutor to destroy the defendant's credibility as a witness—created an unfairness that (it's clear to us) required a new trial. In our case, by contrast, the Government never lied—and, even if it implied something Daniels now thinks was untrue, the issue in question (the location of Daniels's second cellphone) never came up at all during the trial and took up just a few seconds of a 90-minute closing.

*     *     *

After careful review, then, we hereby **ORDER and ADJUDGE** that Daniels's Motion for New Trial [ECF No. 165] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on April 2, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record